IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF OHIO
EASTERN DIVISION

Troy and Amanda Rote,

        Plaintiffs,

    v.

Zel Custom Manufacturing, LLC, et al.,

        Defendants.

Case No: 2:13-cv-1189

Judge Graham

Magistrate Judge Kemp

<u>Opinion and Order</u>

      Plaintiff Troy Rote brings this negligence and products liability action in connection with injuries that he suffered to his right hand and arm when a firearm that he was attempting to operate malfunctioned. This matter is before the court on the motion to dismiss of defendant Fabrica Militar Fray Luis Beltran (a/k/a Dirección General de Fabricaciones Militares or "DGFM"), which argues that it is entitled to foreign sovereign immunity. For the reasons set forth below, the court finds that the complaint sets forth allegations supporting application of the commercial activity exception to foreign sovereign immunity and thus denies the motion.

I.    **Factual Allegations**

      Rote alleges that on September 10, 2011, he was present as an invited guest on real property owned by defendants Gary and Judith Buyer in Sunbury, Ohio. Between 12 and 15 other guests were present, including defendant Edward Grimm, who owned and brought with him a .50 caliber rifle. According to the complaint, Grimm assembled the upper receiver and the lower receiver of the firearm that day on the premises of the Buyers' property.

      At Grimm's invitation, and with the Buyers' knowledge, 5 or 6 people fired the rifle. Grimm then invited Rote to fire the rifle. Grimm provided loading and firing instructions to Rote and also provided ammunition. As Rote was loading the rifle with a 12.7 x 99 mm round of ammunition, the ammunition allegedly exploded, causing injuries to Rote's right hand and arm. According to the complaint, the "round loaded into the chamber of the .50 caliber rifle exploded before the bolt moved to the position of being closed and secured, a condition commonly referred to as 'being out of battery.'" Third Am. Compl., ¶ 29.

The complaint alleges that the rifle was composed of an upper receiver manufactured by defendant Zel Custom Manufacturing, LLC and a lower receiver manufactured by defendant Bushmaster Firearms International, LLC.  The Zel upper receiver was allegedly purchased from defendant Vance Outdoors, Inc., and Grimm allegedly purchased the lower receiver directly from Bushmaster.

The round that exploded was allegedly from a box of ammunition bearing marks identifying it as being made by defendant DGFM.  The ammunition was allegedly purchased from defendant Ammoman.com, a company in New Jersey.

The complaint alleges that the wrongful acts by DGFM consisted of its defective design and manufacture of the ammunition due to a "protruding primer."  See Oxford English Dictionary (3rd Ed.) (defining a primer as a "cap or cylinder containing a compound which responds to friction, an electric spark, etc., and ignites the charge in a cartridge or explosive.").  The complaint further alleges that DGFM failed to provide an adequate warning regarding the hazards posed by a protruding primer.

The complaint asserts negligence claims against Grimm and the Buyers (Count I), a premises liability claim against the Buyers (Count II), Ohio Products Liability Act claims, including strict liability against Zel, Bushmaster, Vance, Ammoman, and DGFM (Count III), supplier liability claims against Zel, Bushmaster, Vance, Ammoman, and DGFM (Count IV), and a loss of consortium claim against all defendants (Count V).

## II.    Discussion

### A.    Standard of Review

The Foreign Sovereign Immunities Act ("FSIA"), 28 U.S.C. § 1602 et seq., provides the sole basis for courts in the United States to obtain jurisdiction over a foreign sovereign.  See Republic of Argentina. v. Weltover, Inc., 504 U.S. 607, 611 (1992).   The FSIA provides that a "foreign state shall be immune from the jurisdiction of the courts of the United States and of the States except as provided in sections 1605 to 1607 of this chapter."  28 U.S.C. § 1604.   "The party claiming FSIA immunity bears the initial burden of proof of establishing a prima facie case that it satisfies the FSIA's definition of a foreign state; once this prima facie case is established, the burden of production shifts to the non-movant to show that an exception applies."  Keller v. Cent. Bank of Nigeria, 277 F.3d 811, 815 (6th Cir. 2002); see also Am. Telecom Co., L.L.C. v. Republic of Lebanon, 501 F.3d 534, 537 (6th Cir. 2007).

The complaint acknowledges that DGFM is a foreign sovereign.  It alleges that DGFM is "an instrumentality of the Argentine government, currently under the supervision of the Argentine Ministry of Defense."  Third Am. Compl., ¶ 16.  Under the FSIA, the definition of a "foreign state" includes its agencies and instrumentalities.  See 28 U.S.C. § 1603(a).

In its motion to dismiss, DGFM makes a facial challenge to subject matter jurisdiction.  It argues that the complaint's allegations do not provide a basis from which a plausible inference can be made that one of the exceptions to immunity applies.  "Federal courts have consistently applied the FSIA's burden-shifting process to facial motions to dismiss; in doing so, courts simply look to the general standards for evaluating motions to dismiss pursuant to Rule 12(b)(1) and take the factual allegations of the plaintiff as true."  O'Bryan v. Holy See, 556 F.3d 361, 376 (6th Cir. 2009) (citing Kilburn v. Socialist People's Libyan Arab Jamahiriya, 376 F.3d 1123, 1127 (D.C. Cir. 2004) ("[I]f the defendant challenges only the legal sufficiency of the plaintiff's jurisdictional allegations, then the district court should take the plaintiff's factual allegations as true and determine whether they bring the case within any of the [FSIA] exceptions to immunity invoked by the plaintiff.") (internal quotation marks omitted)).

## B.     Waiver of Sovereign Immunity

As an initial matter, Rote contends that DGFM waived its ability to seek entitlement to immunity from suit.  Under the FSIA, a foreign state is not immune in any case "in which the foreign state has waived its immunity either explicitly or by implication, notwithstanding any withdrawal of the waiver which the foreign state may purport to effect except in accordance with the terms of the waiver."  28 U.S.C. § 1605(a)(1).

The waiver provision has been narrowly construed, such that the waiver must be clear and unambiguous.  See generally Charles Alan Wright, et al., 14A Federal Practice & Procedure § 3662.3 (4th Ed. 2013).  Courts have found an implicit waiver in three situations: "when (1) a foreign state has agreed to arbitrate in another country; (2) a foreign state has agreed that the law of a particular country shall govern; or (3) a foreign state has filed a responsive pleading but has failed to raise the defense of sovereign immunity."  Cargill Int'l S.A. v. M/T Pavel Dybenko, 991 F.2d 1012, 1017 (2d Cir. 1993) (citing legislative history of the FSIA).  Accord In re Republic of Philippines, 309 F.3d 1143, 1151 (9th Cir. 2002); Abur v. Republic of Sudan, 437 F.Supp.2d 166, 178 (D. D.C. 2006).

Rote argues that DGFM implicitly waived immunity.  In January 2014 DGFM participated in a conference of the parties under Federal Rule of Civil Procedure 26(f).  DGFM asserted in the parties' Rule 26(f) report that it had not been properly served under 28 U.S.C. § 1608.  See Doc. 34,

3

§ 4. Rote argues that DGFM waived immunity because it did not raise a sovereign immunity objection to jurisdiction in the Rule 26(f) report.

The court disagrees and finds that DGFM did not implicitly waive its immunity defense. At the time of the Rule 26 conference, DGFM had not been served and it properly asserted an objection on that ground in the Rule 26(f) report. A Rule 26(f) report plainly is not a responsive pleading. See Fed. R. Civ. P. 7(a). Once DGFM was served in July 2014, it timely moved to dismiss on grounds of sovereign immunity. This is not a situation in which the foreign state filed a responsive pleading but failed to raise the sovereign immunity defense.

In Hirsh v. State of Israel, 962 F. Supp. 377 (S.D.N.Y. 1997), the court rejected a waiver argument similar to the one raised here. Plaintiffs argued that the Federal Republic of Germany had implicitly waived immunity by waiting to raise the defense until after it had "appeared first in court in writing" by way of a letter advising the court that it had not been properly served. 962 F. Supp. at 380. The court disagreed, holding that "Germany's letter is not a 'responsive pleading.' . . . The Court finds that Germany preserved its defense of sovereign immunity by raising it in the instant motion to dismiss the complaint." Id.

Moreover, this is not a situation in which DGFM's assertion of the immunity defense has taken plaintiff by surprise. DGFM has demonstrated that it informed plaintiff three months prior to service that DGFM, if served, intended to raise sovereign immunity as a defense. See Doc. 73, Ex. A, pp. 3-4.

The court thus finds that DGFM has not waived the defense of sovereign immunity.

**C.     Gravamen of the Conduct Alleged**

The FSIA contains several exceptions to sovereign immunity, including a commercial activity exception and a tortious act exception. See 28 U.S.C. § 1605(a)(2), (5). The complaint brings claims for products liability against DGFM. Rote does not argue for application of the tortious act exception to sovereign immunity, but instead seeks to apply the commercial activity exception.

The Sixth Circuit has instructed courts to "look to the core of the activities alleged to be commercial in nature" in determining if the commercial activity exception to immunity may apply. O'Bryan, 556 F.3d at 380 (citing Weltover, 504 U.S. 607 and Saudi Arabia v. Nelson, 507 U.S. 349 (1993)). The court adopted the "gravamen" test as stated by another court:

> Nelson rest[s] on a broader principle, directing district courts first to ascertain the claim's gravamen to determine whether the FSIA plaintiff is simply using creative nomenclature as a semantic ploy to shroud the true essence of its theory and obtain

4

jurisdiction over a claim that Congress did not intend to be brought against a foreign sovereign.

O'Bryan, 556 F.3d at 380 (quoting Leutwyler v. Office of Her Majesty Queen Rania Al Abdullah, 184 F.Supp.2d 277, 299 (S.D.N.Y. 2001) (internal quotation marks and citation omitted)).  But see Doe v. Holy See, 557 F.3d 1066, 1086, 1094-96 (9th Cir. 2009) (Berzon, J., dissenting in part) (critiquing the "essence" or "gravamen" test as not supported by the language of the FSIA); Westfield v. Federal Republic of Germany, 633 F.3d 409 (6th Cir. 2011) (analyzing a claim for conversion under the commercial activity exception without first considering the gravamen of the claim).

In O'Bryan, the gravamen of plaintiffs' claims was alleged sexually-abusive conduct by priests, which in turn was allegedly facilitated by the tortious conduct of representatives of the Holy See.  See O'Bryan, 556 F.3d at 380.  Because the allegations sounded in tort and did not concern any commercial activity, the court rejected plaintiff's attempt to apply the commercial activity exception.

The court finds here that Rote may seek application of the commercial activity exception. The tortious act exception begins with an important proviso.  A foreign state is not immune in any case "*not otherwise encompassed in paragraph (2) above*, in which money damages are sought against a foreign state for personal injury or death, or damage to or loss of property, occurring in the United States and caused by the tortious act or omission of that foreign state caused by the tortious act or omission of that foreign state or of any official or employee of that foreign state while acting within the scope of his office or employment."  28 U.S.C. § 1605(5) (emphasis added).  Paragraph (2) is the commercial activity exception.

It is true that Rote's products liability claims sound in tort, particularly when he has not alleged privity between he and DGFM.  See MacPherson v. Buick Motor Co., 217 N.Y. 382, 111 N.E. 1050 (N.Y. 1916) (Cardozo, J.); Restatement (Third) of Torts: Products Liability, § 1; Restatement (Second) of Torts, § 402A.  But his claims also sound in commercial activity.  At the core of the activity alleged is the manufacture of a good that entered the stream of commerce and satisfied demand for a product.[1]  The FSIA defines commercial activity as either a "course of

---

[1] The complaint does not allege how the ammunition went from the point of manufacture to seller Ammoman.  It could be the case, as DGFM suggests, that the ammunition was not intended to have entered the stream of commerce as such – that DGFM manufactured it for use by the Argentine military.  Nonetheless, DGFM's manufacture of ammunition satisfied demand for a product and, as will be discussed below, can be considered commercial in nature.  See infra Part II.D.3.  In any event, the complaint does not allege that the ammunition Rote used was stolen from DGFM, so one

commercial conduct" or a "particular commercial transaction."  28 U.S.C. § 1603(d); see also Weltover, 504 U.S. at 614 (holding that commercial activity refers to participation in the market "in the manner of a private player").  Rote thus is not resorting to a semantic ploy in seeking application of the commercial activity exception.

Notably, the Sixth Circuit in O'Bryan indicated that a products liability claim could be considered under the commercial activity.  In discussing a similar tort case in the District of Oregon, the Sixth Circuit quoted with approval the district court's analysis:

> [T]he Supreme Court has counseled courts not to lose sight of the ultimate issue: whether the true essence of the complaint is commercial.  Nelson, 507 U.S. at 363, 113 S.Ct. 1471.  Here, plaintiff's complaint does not allege property damage, breach of contract for goods or services, *product liability*, copyright infringement, an indebtedness yet unpaid on a loan or other transaction, or any other theory whose true essence is commercial.  Instead, at the heart of plaintiff's complaint is the injury inflicted by a sexually abusive priest at plaintiff's church, a claim clearly sounding in tort.

O'Bryan, 556 F.3d at 380 (quoting Doe v. Holy See, 434 F.Supp.2d 925, 942 (D. Or. 2006) (emphasis added)).

The Fifth Circuit has held that the gravamen of a products liability suit regarding industrial machinery is commercial in nature.  In Aldy v. Valmet Paper Machinery, the court found that "the gravamen of the plaintiffs' suits are that the paper machine was unreasonably dangerous in its construction, make-up composition and design.  In short, the plaintiffs' suits appear to be classic design and manufacturing defect suits, which the third clause of the commercial activities exception is broad enough to cover." 74 F.3d 72, 75 (5th Cir. 1996) (internal quotation marks omitted).  Other Circuits too have applied the commercial activity exception to products liability claims.  See Lyon v. Agusta S.P.A., 252 F.3d 1078, 1083 (9th Cir. 2001) (aircraft); Vermeulen v. Renault U.S.A., Inc., 985 F.2d 1534, 1544 n.13 (11th Cir. 1993) (automobile – noting that the "fact that Vermeulen seeks to recover for personal injuries does not belie the commercial nature of [Renault's] activity").

Accordingly, the court finds Rote may seek application of the commercial activity exception for his products liability claims.

---

may plausibly infer that the foreign state at some point put the ammunition into the stream of commerce.  See Third Am. Compl., ¶ 107 (alleging that the defendant manufacturers – Zel, Bushmaster and DGFM – introduced their goods into the stream of commerce).

### D.     Commercial Activity Exception

The commercial activity exception provides that a foreign state is not immune in any case:

[1] in which the action is based upon a commercial activity carried on in the United States by the foreign state; [2] or upon an act performed in the United States in connection with a commercial activity of the foreign state elsewhere; [3] or upon an act outside the territory of the United States in connection with a commercial activity of the foreign state elsewhere and that act causes a direct effect in the United States.

28 U.S.C. § 1605(a)(2).

### 1.     An Act Outside of the United States

Rote contends that the third clause of the commercial activity exception applies – the clause concerning an act outside of the United States.  The complaint alleges that DGFM "is engaged in the business of manufacturing ammunition" and further alleges that DGFM negligently designed and manufactured the ammunition.  Third Am. Compl., ¶ 9.  Although the complaint does not expressly allege that the acts of design and manufacture took place outside of the United States, it supports a plausible inference that they occurred in Argentina.  The complaint alleges that DGFM operates under the supervision of the Argentine Ministry of Defense, and thus, inferring DGFM conducts its business in Argentina, the alleged wrongful acts took place there.  See Lyon, 252 F.3d at 1083 (alleged negligence in the design and manufacture of an aircraft by a foreign state took place outside of the United States); Vermeulen, 985 F.2d at 1543-44 (alleged negligence in the design and manufacture of an automobile by a foreign state took place in France, where the car was designed and produced).

As for the allegation that DGFM failed to provide warnings about the risks of using the ammunition, again the complaint supports a plausible inference that the alleged wrongful act took place in Argentina.  Reasonably construed, the complaint alleges that that DGFM should have provided instructions and warnings with the packaging of the ammunition when it was manufactured.  See Third Am. Compl., ¶¶ 90-92.

### 2.     The "Based Upon" Requirement

A requirement common to all three clauses of § 1605(2) is that the cause of action be "based upon" the act or activity of the foreign state.  See Nelson, 507 U.S. at 357-58 ("In denoting conduct that forms the 'basis,' or 'foundation,' for a claim, . . . the phrase is read most naturally to mean those elements of a claim that, if proven, would entitle a plaintiff to relief under his theory of the case.") (citations omitted).  The "based upon" requirement is not contested here, as it is clear that Rote's action is based upon DGFM's allegedly defective design and manufacture of ammunition and

upon its failure to warn. See Sun v. Taiwan, 201 F.3d 1105, 1110 (9th Cir. 2000) (the act or activity must be "involved in proving" one of the elements of the cause of action).

### 3. Commercial Activity

Plaintiff must next establish that the wrongful acts were "in connection with a commercial activity" of the foreign state. A "commercial activity" means "either a regular course of commercial conduct or a particular commercial transaction or act." 28 U.S.C. § 1603(d). "The commercial character of an activity shall be determined by reference to the nature of the course of conduct or particular transaction or act, rather than by reference to its purpose." Id. The Supreme Court has analyzed this requirement as follows:

> [W]hen a foreign government acts, not as regulator of a market, but in the manner of a private player within it, the foreign sovereign's actions are "commercial" within the meaning of the FSIA. Moreover, because the Act provides that the commercial character of an act is to be determined by reference to its "nature" rather than its "purpose," the question is not whether the foreign government is acting with a profit motive or instead with the aim of fulfilling uniquely sovereign objectives. Rather, the issue is whether the particular actions that the foreign state performs (whatever the motive behind them) are the type of actions by which a private party engages in trade and traffic or commerce.

Weltover, 504 U.S. at 614.

The court agrees with Rote's argument that the commercial activity requirement is satisfied because the alleged wrongful acts of DGFM took place in connection with its business of manufacturing ammunition. DGFM responds that helping provide for a national defense is not a commercial activity.[2] But the purpose for which DGFM made the ammunition is not the relevant inquiry. See U.S.C. § 1603(d); Weltover, 504 U.S. at 614. The production and acquisition of goods, including ammunition, is commercial in nature. It is precisely what private parties do when they engage in trade, traffic or commerce. Indeed the Court in Weltover stated in *dicta*: "a foreign government's issuance of regulations limiting foreign currency exchange is a sovereign activity, because such authoritative control of commerce cannot be exercised by a private party; whereas a contract to buy army boots or *even bullets* is a 'commercial' activity, because private companies can similarly use sales contracts to acquire goods." Id. (emphasis added). See also Texas Trading & Mill. Corp. v. Federal Republic of Nigeria, 647 F.2d 300, 310 n.27 (2d Cir. 1981) (noting that the FSIA

---

[2] Though the complaint does not expressly allege whether DGFM supplied ammunition to the Argentine military, such an inference is plausible given the allegations that DGFM operated under the supervision of the Ministry of Defense and produced 12.7 x 99 mm ammunition.

superseded prior cases which found that government contracts to supply "bullets for the army" were not commercial in nature).

The case law thus distinguishes a foreign state's policy and regulatory decisions in maintaining a national defense or in using force from, as is the case here, its participation in the marketplace for military goods and services.  See UNC Lear Services, Inc. v. Kingdom of Saudi Arabia, 581 F.3d 210, 216-17 (5th Cir. 2009) (staffing of military personnel was not a commercial activity but purchase of repair services for military airplane parts was commercial).  Compare Garb v. Republic of Poland, 440 F.3d 579, 586-87 (2d Cir. 2006) (government's expropriation of real property from Jews following World War II was not a commercial activity); Beg v. Islamic Republic of Pakistan, 353 F.3d 1323, 1326 (11th Cir. 2003) (expropriation of real property by military was not a commercial activity); Butters v. Vance Int'l, Inc., 225 F.3d 462, 465 (4th Cir. 2000) (refusal to hire females to fill security position was not a commercial activity), with McDonnell Douglas Corp. v. Islamic Republic of Iran, 758 F.2d 341, 349 (8th Cir. 1985) ("[A] contract by a foreign government to buy equipment for its armed services constitutes a commercial activity . . . ."); Bell Helicopter Textron Inc. v. Islamic Republic of Iran, 892 F.Supp.2d 219, 226 (D. D.C 2012) (production of helicopters, including militarized versions, was a commercial activity); Triple A Int'l, Inc. v. Democratic Republic of the Congo, 852 F.Supp.2d 839, 844 n.7 (E.D. Mich. 2012) (acquisition of military uniforms, boots and sleeping bags was a commercial activity).

### 4. Direct Effect

Finally, a plaintiff seeking application of the third clause of the commercial activity exception commercial must establish that the "act causes a direct effect in the United States."  "An effect is direct if it follows as an immediate consequence" of the defendant's act.  Weltover, 504 U.S. at 618 (internal quotations omitted).  "The effect need not be foreseeable or substantial but 'jurisdiction may not be predicated on purely trivial effects in the United States.'"  Westfield, 633 F.3d at 414 (quoting Weltover, 504 U.S. at 618).  "When considering whether an action caused a direct effect in the United States we are cognizant of the Act's presumption that foreign sovereigns are immune, and wary of applying this requirement too loosely such that our courts become a haven for airing the world's disputes."  Id.

The direct effect requirement is sometimes an elusive one to apply.  As the Sixth Circuit has observed, "Courts have struggled to announce objective standards and clear rules for determining what does and does not qualify as a direct effect in the United States.  Without objective standards to guide us, much of our analysis is drawn from comparison to other decisions addressing the scope

of the direct effect requirement, many of which involve bonds issued by foreign governments." Westfield, 633 F.3d at 414-15.

Much of the case law does involve performance of financial obligations or some other contractual duties. A direct effect is caused in the United States when a sovereign fails to satisfy a contractual obligation under which the United States is the place of performance. See e.g., Weltover, 504 U.S. at 619 ("Because New York was thus the place of performance for Argentina's ultimate contractual obligations, the rescheduling of those obligations necessarily had a 'direct effect' in the United States: Money that was supposed to have been delivered to a New York bank for deposit was not forthcoming."); Keller, 277 F.3d at 818 (holding that failure to perform duty to pay funds to U.S. bank account caused a direct effect); De Csepel v. Republic of Hungary, 714 F.3d 591, 601 (D.C. Cir. 2013) (holding that failure to perform bailment contract's obligation to return property to the United States had a direct effect); UNC Lear, 581 F.3d at 218-19 (holding that sovereign's alleged failure to pay for repair services to military aircraft parts had a direct effect because place of repairs and payment was the United States).

In contrast, a direct effect is not caused in the United States if the place of performance is entirely outside of the United States. See, e.g., Westfield, 633 F.3d at 416 ("[I]f the funds are only payable in a foreign country, failure to receive those funds does not cause direct effects in the United States."); Am. Telecom, 501 F.3d at 541; Rogers v. Petroleo Brasileiro, S.A., 673 F.3d 131, 139-40 (2d Cir. 2012); Big Sky Network Can., Ltd. v. Sichuan Provincial Gov't, 533 F.3d 1183, 1191 (10th Cir. 2008).

In the case at hand, DGFM argues that the complaint does not satisfy the direct effect requirement because it fails to allege that DGFM entered into an agreement or relationship whereby it became obligated to supply or sell the allegedly defective ammunition to the United States.[3] DGFM cites Westfield in support of its argument that the direct effect requirement cannot be satisfied absent some agreement by DGFM to deliver ammunition to the United States. In Westfield, heirs of an estate brought a claim for conversion to recover art taken from German Jew and art collector Walter Westfeld during the Nazi regime. The heirs, who resided in Tennessee, alleged that Westfeld had attempted to flee Germany with his art collection and had planned to go to the United States. Westfeld was unable to leave Germany and Nazi officials killed him and seized

---

[3] Plaintiff has not offered any analysis of the direct effect requirement. Plaintiff's brief, in making a passing reference to the requirement, indicates a belief that the direct effect requirement is treated the same as the "based upon" requirement of the commercial activity exception. See Doc. 72 at 5. Plaintiff is mistaken. See Weltover, 504 U.S. at 617-18, Nelson, 507 U.S. at 357-58.

his art collection.  The Sixth Circuit, noting that the direct effect requirement is "amorphous and hard to define" outside the context of financial and contractual obligations, held that the seizure of art did not cause a direct effect in the United States:

> The seizure undoubtedly prevented Westfeld from disposing of his collection, but any effects felt in the United States did not follow as an immediate consequence of Germany's actions.  Germany acted entirely within its borders and the only connection to the United States is because Westfeld planned to send the artwork to Nashville.  The complaint does not state that Germany ever promised to send the artwork to the United States.  Additionally, none of the Heirs or Westfeld's relatives in the United States had any actual ownership interest in the property at the time of the seizure.  While Westfeld's plans to send the artwork to the United States meant that Germany's actions had effects here, they were not direct.  Concluding otherwise would effectively read the "direct" requirement out of the statute and greatly expand the jurisdiction of our courts in contrast to Congress's goals in enacting the Foreign Sovereign Immunities Act.

633 F.3d at 417.

The court agrees with DGFM that the complaint contains no allegations concerning how the ammunition ended up in the United States.  But the court does not view the absence of a promise or obligation by DGFM to deliver ammunition to the United States to be the end of the inquiry.  Demonstrating that the foreign state has an obligation running to the United States is simply one way to satisfy the direct effect requirement.  At the same time, Westfield and other decisions involving tort claims against a foreign state make clear that an injury felt in the United States, standing alone, does not constitute a direct effect.  See Westfield, 633 F.3d at 417 ("As appalling as the Nazis' actions were, the reverberations felt from them in Nashville were derivative of Germany's seizure and not direct effects."); Guirlando v. T.C. Ziraat Bankasi A.S., 602 F.3d 69, 78 (2d Cir. 2010) (finding no direct effect, where plaintiff asserted tort claims against a Turkish bank after funds were stolen from her account, because "the mere fact that a foreign state's commercial activity outside of the United States caused physical or financial injury to a United States citizen is not itself sufficient to constitute a direct effect in the United States"); United World Trade, Inc. v. Mangyshlakneft Oil Prod. Ass'n, 33 F.3d 1232, 1238 (10th Cir. 1994) (holding in action for fraud, as well as for breach of contract, that "Congress did not intend to provide jurisdiction whenever the ripples caused by an overseas transaction manage eventually to reach the shores of the United States."); Antares Aircraft, L.P. v. Fed. Republic of Nigeria, 999 F.2d 33, 36-37 (2d Cir. 1993) (finding no direct effect, where plaintiff asserted a wrongful detention claim relating to plaintiff's airplane being held at a Nigerian airport, because the "detention of, and physical damage to, the

plane happened in Nigeria . . . . If a loss to an American individual and firm resulting from a foreign tort were sufficient standing alone to satisfy the direct effect requirement, the commercial activity exception would in large part eviscerate the FSIA's provision of immunity for foreign states.").

Nonetheless, what distinguishes this products liability case from those tort cases is that the complaint alleges an immediate consequence in the United States of defendant's wrongful act that directly caused personal injury in the United States. In Westfield and Antares Aircraft, for instance, the direct effects of the seizure of artwork and detention of the airplane were the loss of the owners' possession and use of the objects, and this occurred in the foreign state where the objects were physically located. Here, the alleged immediate consequence of the protruding primer was "unintended premature contact with a surface point of the bolt or firing pin resulting in out of battery detonation." Third Am. Compl., ¶ 92. That is, the direct effect of the alleged defect was that the round prematurely detonated, in turn injuring Rote. The location of the alleged premature detonation was Sunbury, Ohio. It does not matter, for purposes of the commercial activity exception, whether DGFM could foresee that the defective round would end up in Ohio. See Weltover, 504 U.S. at 618.

Though the case law is sparse, courts have found the direct effect requirement to be satisfied in products liability cases where the malfunction occurred in the United States. In Vermeulen, plaintiff alleged that the passenger restraint system of her car was defectively designed and manufactured by Renault in France. Plaintiff suffered injuries as a result of an accident in the United States and claimed that the injuries were caused by the defective restraint system. The court held, "We can hardly imagine a more immediate consequence of the defendant's activity. Thus, under the definition articulated in [Weltover], the act upon which Vermeulen's claim is based had a direct effect in the United States." 985 F.2d at 1545.

In Aldy, plaintiffs alleged that a paper machine was defectively designed and manufactured in Finland and caused injuries in a Louisiana paper mill. The court held that the direct effect requirement was satisfied: "the Aldys and Malones contend that Aldy's and Malone's deaths were an immediate consequence of Valmet's negligent design and manufacturing of the paper machine. These allegations are sufficient to confer subject matter jurisdiction." 74 F.3d at 75.

The Ninth Circuit in Lyon provided further elaboration of what constitutes a direct effect in a products liability case. There, three individuals were killed when an Italian-built airplane crashed in California. The descendants of the crash victims brought a products liability suit against an instrumentality of the Republic of Italy that had designed and manufactured the plane. The court

began by rejecting, as contrary to <u>Weltover</u>, prior case law holding that a direct effect required foreseeability. 252 F.3d at 1082-83.

> Once we eschew both substantiality and foreseeability, we must interpret "immediate consequence" to mean something different from those terms. Particularly where failure of a manufactured product is concerned, a more appropriate reading of the phrase should focus on whether some intervening act broke the chain of causation leading from the asserted wrongful act to its impact in the United States. . . . A defective product fail[s] because of the defect; the consequence could hardly be more immediate.
>
> . . . [I]t is pellucid that the line between the defective production of the aircraft and the failure of that product because of the defect was a straight one. The acts which resulted in production of an allegedly defective product were legally significant and gave rise to the claim at hand.
>
> Therefore, we hold that we do have jurisdiction. In so stating, we recognize that much time passed between the manufacture and the injury and that the aircraft even changed hands. Still, time itself is linear, and while questions about its ravages, or speculation about the ravages of others along the way, may affect proof, they do not affect jurisdiction.

<u>Lyon</u>, 252 F.3d at 1083-84 (footnote and citation omitted).

This court finds <u>Lyon</u>'s analysis of the direct effect requirement in the context of a products liability claim to be persuasive. Applying that analysis to the case at hand compels the conclusion that DGFM's act caused a direct effect in the United States. An immediate consequence of the alleged defect in the ammunition designed and manufactured by DGFM is that the round prematurely detonated when loaded into a firearm in Sunbury, Ohio. While plaintiff brings this action as a multi-tortfeasor suit – alleging that two components of the rifle itself were defective – the complaint does not contain allegations of an intervening act that broke the chain of causation with respect to the ammunition. The complaint alleges that the ammunition contained a defect from its inception, and not that some later modification by another party made the ammunition defective.

## III.  Conclusion

Accordingly, DGFM's motion to dismiss the claims against it (doc. 58) is DENIED.

s/ James L. Graham
JAMES L. GRAHAM
United States District Judge

DATE: February 11, 2015