IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF OHIO
EASTERN DIVISION

Troy and Amanda Rote,

        Plaintiffs,

   v.

Zel Custom Manufacturing, LLC, et al.,

        Defendants.

Case No: 2:13-cv-1189

Judge Graham

<u>Opinion and Order</u>

    This once-complicated tort action now presents one main question: do the provisions of the Ohio Product Liability Act which impose liability on the "manufacturer" of a "product" apply to a foreign sovereign who manufactured ammunition for military use in 1982? The court finds that the ammunition falls outside the definition of a "product" under the OPLA because it was not manufactured for introduction into trade or commerce and was not intended for sale. Thus, the motion for summary judgment of defendant Dirección General de Fabricaciones Militares ("DGFM") is GRANTED.

**I.    Background**

    This case involves the sort of fact pattern one might expect to find in a law school exam. Plaintiff Troy Rote was invited to a party being held in Sunbury, Ohio on a 14-acre piece of property owned by of defendants Gary and Judith Buyer. <u>See</u> G. Buyer Dep. at 24. The party, convened on September 10, 2011 to celebrate Mr. Buyer's birthday, featured college football watching, rifle shooting and beer drinking. <u>See</u> Rote Dep. at 47, 50. At Mr. Buyer's request, defendant Edward Grimm came to the party with a .50 caliber, bolt-action rifle he owned. <u>See</u> Grimm Dep. at 93. Grimm had constructed the firearm by removing the lower receiver from a semi-automatic rifle, which was manufactured by defendant Bushmaster Firearms and sold by defendant Vance Outdoor, and assembling it to an upper receiver manufactured by defendant Zel Custom and sold by Vance. <u>See id</u>. at 69-70.

    Grimm also brought to the party ammunition he purchased online from defendant Ammoman.com. <u>See id</u>. at 81-82. The rounds of ammunition came in a plain brown box with no

1

markings. See Doc. 152-1 at PAGEID 1467. Each round had a headstamp of "02 FLB 82." Id. It is undisputed that the headstamp belongs to DGFM, an instrumentality of the Republic of Argentina operating under the supervision of its Ministry of Defense. The headstamp signifies that the rounds were manufactured by DGFM in February 1982 at a government munitions factory in the city of Fray Luis Beltrán, Argentina. See Arpin Decl. at ¶ 7. The ammunition was manufactured for military use, but DGFM is aware of two instances in which ammunition of the type that allegedly injured Rote passed out of the control of the Argentine military: (1) when Argentina lost the Falkland Islands War in June 1982 and possibly abandoned some amount of military equipment there and (2) when a cabal of Argentine government officials unlawfully sold armaments and ammunition in the early 1990s to the Croatian military during its war of independence against Yugoslavia. More on this later.

Several people at the party shot the rifle. Rote initially declined an opportunity to shoot it, but he agreed to give it a try at the urging of Buyer and Grimm. See Rote Dep. at 70, 187-88. Rote placed a round in the chamber, and attempted to push the bolt forward. He felt some resistance as he did so, and Grimm advised him to force the bolt shut. See id. at 62, 82. When Rote exerted more force, the round detonated out-of-battery and injured his hand. See id. at 84, 87.

Plaintiff filed this suit in state court and asserted various state law claims, including negligence, premises liability and violations of the OPLA. DGFM removed the action to federal court, invoking the removal provision for actions against foreign states. See 28 U.S.C. § 1441(d). DGFM then moved to dismiss the claims against it on the basis of foreign sovereign immunity. The court denied the motion and the Sixth Circuit affirmed, holding that DGFM was not entitled to sovereign immunity. See Rote v. Zel Custom Mfg., LLC, 816 F.3d 383 (6th Cir. 2016).

After engaging in extensive discovery, including much expert discovery, the parties have reported that all claims have been settled, except plaintiff's claims against DGFM and Ammoman. See Doc. 258.

In the Third Amended Complaint, plaintiff asserts that DGFM violated the OPLA by: (1) failing to provide adequate warnings about its ammunition, (2) producing the ammunition out of compliance with manufacturer's representations and (3) defectively designing and manufacturing the ammunition. See O.R.C. §§ 2307.71-.77. Plaintiff asserts that Ammoman is liable as a supplier of the allegedly defective ammunition. See O.R.C. §§ 2307.78. Additionally, plaintiff's spouse asserts a claim for loss of consortium.

This matter is before the court on DGFM's motion for summary judgment. Plaintiff does not contest DGFM's motion as it concerns his second and third OPLA claims – those for

2

noncompliance with manufacturer's representations and for defective design and manufacture – and the court will grant the motion as to those claims.[1] As plaintiff puts it, the crux his claim against DGFM is for failure to provide adequate warnings about the ammunition. See Doc. 200 at PAGEID 4100. According to plaintiff, DGFM should have placed its ammunition in packaging denoting it as "military surplus" or "only appropriate for use in a machine gun." Id.

## II.    Standard of Review

Under Federal Rule of Civil Procedure 56, summary judgment is proper if the evidentiary materials in the record show that there is "no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); see Longaberger Co. v. Kolt, 586 F.3d 459, 465 (6th Cir. 2009). The moving party bears the burden of proving the absence of genuine issues of material fact and its entitlement to judgment as a matter of law, which may be accomplished by demonstrating that the nonmoving party lacks evidence to support an essential element of its case on which it would bear the burden of proof at trial. See Celotex Corp. v. Catrett, 477 U.S. 317, 322-23 (1986); Walton v. Ford Motor Co., 424 F.3d 481, 485 (6th Cir. 2005).

The "mere existence of *some* alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no *genuine* issue of *material* fact." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 247-48 (1986) (emphasis in original); see also Longaberger, 586 F.3d at 465. "Only disputed material facts, those 'that might affect the outcome of the suit under the governing law,' will preclude summary judgment." Daugherty v. Sajar Plastics, Inc., 544 F.3d 696, 702 (6th Cir. 2008) (quoting Anderson, 477 U.S. at 248). Accordingly, the nonmoving party must present "significant probative evidence" to demonstrate that "there is [more than] some metaphysical doubt as to the material facts." Moore v. Philip Morris Cos., Inc., 8 F.3d 335, 340 (6th Cir. 1993).

A district court considering a motion for summary judgment may not weigh evidence or make credibility determinations. Daugherty, 544 F.3d at 702; Adams v. Metiva, 31 F.3d 375, 379 (6th Cir. 1994). Rather, in reviewing a motion for summary judgment, a court must determine whether "the

---

[1] The complaint alleged that the defective design and manufacture was due to a "protruding primer." Discovery established that the ammunition did not have a protruding primer.

Defendant Zel filed a separate opposition brief to DGFM's motion for summary judgment. Zel contends that the ammunition which injured Rote was defective because the shoulder and neck measurements varied from design specifications. Plaintiff, however, has not adopted this theory of recovery and the court dismisses plaintiff's claim for defective design and manufacture.

3

evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." Anderson, 477 U.S. at 251-52. The evidence, all facts, and any inferences that may permissibly be drawn from the facts must be viewed in the light most favorable to the nonmoving party. Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986); Eastman Kodak Co. v. Image Technical Servs., Inc., 504 U.S. 451, 456 (1992). However, "[t]he mere existence of a scintilla of evidence in support of the plaintiff's position will be insufficient; there must be evidence on which the jury could reasonably find for the plaintiff." Anderson, 477 U.S. at 252; see Dominguez v. Corr. Med. Servs., 555 F.3d 543, 549 (6th Cir. 2009).

**III.  Evidentiary Issues**

In support of its motion for summary judgment, DGFM has submitted two pieces of evidence to which plaintiff objects. One is a declaration and the other is a foreign judgment. Under Rule 56(c)(2), a party "may object that the material cited to support or dispute a fact cannot be presented in a form that would be admissible in evidence."

    **A.  Dr. Arpin's Declaration**

Defendant has submitted the declaration of Dr. Robert Arpin, the Director of Coordination in Argentina's General Directorate of Military Factories. See Doc. 198-5 at PAGEID 4095. Dr. Arpin has held his current position since 1996. He states that he has access to the books and records of DGFM and has reviewed those records as they relate to ammunition manufactured at the factory in Fray Luis Beltrán. See Arpin Decl. at ¶ 3. The headstamp marking of "02 FLB 82" means that DGFM manufactured the ammunition in February 1982 at the Fray Luis Beltrán factory. Id. at ¶ 7. DGFM manufactured 12.7 x 99 millimeter ammunition (also known as .50 caliber) until the mid-1980s. Id. at ¶ 4. The records show that DGFM provided this ammunition solely to the Argentine military. There is no record of sales or deliveries to any person, company or any other entity. Id. at ¶ 5. Dr. Arpin goes on to state that Argentina and the United Kingdom engaged in a military conflict in the Falkland Islands from April to June of 1982. He states that it is possible that Argentine military forces in the conflict abandoned any unused 12.7 x 99 mm cartridges when they withdrew from the Falkland Islands. Id. at ¶ 8.

Plaintiff objects to the declaration on the grounds that Dr. Arpin lacks personal knowledge of the matters set forth in his declaration. A declaration must be made on personal knowledge and set out facts which would be admissible in evidence. Fed. R. Civ. P. 56(c)(4). Plaintiff contends that Dr. Arpin could not have personal knowledge of information predating his employment.

4

The court finds that plaintiff's objection must be denied. As a general matter, the Federal Rules of Evidence do not require that the testimony of a custodian or other qualified witness regarding business records to be based on personal involvement in, or personal knowledge of, the preparation of the records. See United States v. Jenkins, 345 F.3d 928, 935 (6th Cir. 2003) (discussing Fed. R. Evid. 803(6)); Dyno Const. Co. v. McWane, Inc., 198 F.3d 567, 575 (6th Cir. 1999). Plaintiff has raised no objections to Dr. Arpin's qualifications to review the records, only his personal knowledge.

Further, those statements of Dr. Arpin which are based his review of the records (paragraphs 4 to 7 of the Declaration) do not appear to be contested by plaintiff. Plaintiff does not dispute that DGFM manufactured the ammunition at issue, that it did so in February 1982 in Fray Luis Beltrán, that the ammunition was manufactured for military use or that it was not sold or delivered by DGFM to anyone other than the Argentine military. Indeed, plaintiff's theory of the case assumes the first of these facts to be true and is not reliant on the others. See Doc. 205 at PAGEID 4250-52 (plaintiff's brief in which he argues that DGFM manufactured the ammunition and that DGFM's intent for using the ammunition is irrelevant to his OPLA claim); Doc. 193 at PAGEID 2683 (deposition of plaintiff's expert witness stating his opinion that the ammunition was made for military use).

Plaintiff does, however, contest Dr. Arpin's statement concerning the Falkland Islands War (paragraph 8 of the Declaration). His statement is not based on his review of the records but on known historical facts of which the court may take judicial notice. See Fed. R. Civ. P. 201(b)(2); Ohio Bell Tel. Co. v. Pub. Util. Comm'n of Ohio, 301 U.S. 292, 301 (1937). Plaintiff does not dispute that the War took place, that the United Kingdom prevailed or that armaments and ammunition sometimes get abandoned in the theater of conflict. Rather, plaintiff urges the court to reject any suggestion that the particular round of ammunition which injured Rote was in fact abandoned by Argentine forces and taken into the United Kingdom's possession.

Plaintiff is correct that it would be pure speculation to say that Rote was injured by a round which had been left in the Falkland Islands. But defendant has not introduced Dr. Arpin's declaration for that purpose. Instead, abandonment of ammunition after the Falkland Islands War serves as one example of when ammunition of the type at issue possibly passed out of the control of the defendant foreign sovereign. This example will be discussed below in relation to the statutory prerequisites for applying the OPLA.

### B. The Foreign Judgment

The foreign judgment contains adjudicated facts which provide a second example of when ammunition of the type that allegedly injured Rote passed out of the control of the foreign sovereign.

See Doc. 198-3 at PAGEID 3854. Defendant has submitted a copy of the original foreign judgment in Spanish, as well as an English translation. The foreign judgment is 227 pages long, but here are the basics. The foreign judgment was issued on March 5, 2013 by the Argentine Federal Chamber of Criminal Cassation. The judgment largely upholds the criminal convictions of numerous government officials for smuggling warfare material, including immense amounts of armaments and ammunition, in the 1990s to Croatia (which was under a United Nations arms embargo) and Ecuador. Among the materials smuggled were 12.7 x 99 millimeter cartridges manufactured by DGFM. See id. at PAGEID 3993-94.

Plaintiff objects to the admissibility of the foreign judgment on the grounds that it has not been authenticated. Plaintiff believes that defendant has improperly attempted to authenticate the judgment through defendant's Spanish-to-English language translator. Plaintiff argues that the translator is not qualified to translate the documents because she has no legal training and no personal knowledge of the foreign judgment.

Plaintiff's argument stems from a misunderstanding of the evidentiary rules. Under Federal Rule of Evidence 901(b)(10), authentication may be accomplished by compliance with the Rules of Evidence or with other applicable statutes or rules. Under Federal Rule of Civil Procedure 44(a)(2)(A), a foreign official record may be authenticated by several methods. One method is where the document is evidenced by "an official publication of the record," in which case it is self-authenticating. Fed. R. Civ. P. 44(a)(2)(A)(i); see also 9A Wright & Miller, Fed. Prac. & Proc. §§ 2433, 2435 (3d ed.); Constr. Drilling, Inc. v. Chusid, 63 F.Supp.2d 509, 514 (D.N.J. 1999); Hans Smit, *International Aspects of Federal Civil Procedure*, 61 Colum. L. Rev. 1031, 1061 (1961). "Under this rule, a document that, on its face appears to be an official publication, is admissible, unless a party opposing its admission into evidence shows that it lacks that character." Fed. R. Civ. P. 44, Advisory Comm. Note to the 1966 Amendment to Subdivision (a)(2). This rule is consistent with Rule of Evidence 902(5), which provides that official publications issued by a public authority are self-authenticating. See 5 Federal Evidence § 9:34 n.6 (4th ed.) ("That purported foreign official publications are self-authenticating is expressly said in [Fed. R. Civ. P 44(a)(2)]; it is implicit in Rule 902(5)."). Official publications available electronically from a government website should be accepted by the court as self-authenticating. See, e.g., Williams v. Long, 585 F.Supp.2d 679, 689 (D. Md. 2008); Sannes v. Jeff Wyler Chevrolet, Inc., No. 1:97-cv-930, 1999 WL 33313134 at *3 n.3 (S.D. Ohio Mar. 31, 1999).

The original Spanish foreign judgment appears on its face to be an official publication – it bears the judicial body's name, the case number and name, the date of decision, the city in which the

6

tribunal convened and the names of the judicial officers. The English version of the judgment makes apparent other indicia of an official judicial decision, including operative legal terminology overruling and sustaining various issues on appeal, and instructions on remand to the court of origin. Defendant has provided the online uniform resource locator (URL) from which an electronic version of the foreign judgment is available. The URL bears a domain name and extension (cij.gov.ar) belonging to the Government of Argentina and containing a database of judicial decisions issued by Argentina's federal courts.

Plaintiff has not shown that the foreign judgment lacks the character of an official publication. He objects that the Spanish translator lacks legal training and does not have personal knowledge of the foreign judgment. But plaintiff has cited no authority in support of imposing such requirements, and the court finds that his objections have no merit. A translator is "no more than a language conduit." United States v. Koskerides, 877 F.2d 1129, 1135 (2d Cir. 1989). Accuracy, not the translator's legal training or personal knowledge, is the proper test of a translated document. Cf. United States v. Garcia, 20 F.3d 670, 673 (6th Cir. 1994) ("In asking us to find the admission of the translation an abuse of discretion, Juan Garcia does not point to any inaccuracies in it, nor has he ever offered an alternative translation."). If the translation contains statements not contained in or at variance with the original, then it is subject to objections on the grounds of hearsay or reliability. See United States v. Vidacack, 553 F.3d 344, 352 (4th Cir. 2009); United States v. Martinez-Gaytan, 213 F.3d 890, 892 (5th Cir. 2000).

Plaintiff has not objected to the accuracy of any facet of the translation. The court, therefore, will consider the foreign judgment in ruling upon defendant's motion for summary judgment. A foreign criminal judgment is admissible to prove that the judgment was rendered and to serve as "*prima facie* evidence of the facts adjudicated." United States v. Garland, 991 F.2d 328, 332 (6th Cir. 1993); see also Mike's Train House, Inc. v. Lionel, L.L.C., 472 F.3d 398, 411-12 (6th Cir. 2006).

Defendant believes that the foreign judgment provides the necessary link to prove that the ammunition which allegedly harmed Rote was part of warfare material smuggled to Croatia. Invoices show that defendant Ammoman purchased .50 caliber cartridges in 2009 from a West Coast importer named PW Arm's Inc. See Doc. 197-1 at PAGEID 3608-09 (identifying the .50 caliber cartridges as being "Argentine Mfg."). PW Arm's representative was deposed under Federal Rule of Civil Procedure 30(b)(6). When asked whether the ammunition sold to Ammoman came from cases of armor-piercing rounds he had inspected at a military warehouse in Croatia and purchased through a broker, the representative stated, "I believe so." Phineas Dep. at 20, 26, 44, 45, 47.

7

Plaintiff contends that this evidence does not conclusively establish that the ammunition which injured him came by way of Croatia. The court agrees. Defendant has submitted evidence which may provide a likely explanation for how the ammunition went from Argentina to Ohio. But defendant has not, for instance, shown that Ammoman purchased 12.7 x 99 mm ammunition exclusively from PW Arm's.[2] The court accordingly considers the facts adjudicated in the foreign judgment as evidence of a known example of when ammunition of the type at issue passed out of the control of the foreign sovereign.

## IV. The Ohio Product Liability Act Claim

Plaintiff's claim under the OPLA is for inadequate warning or instruction. Plaintiff contends that DGFM should have marked the boxes in which it placed the ammunition as being military surplus because it is "commonly known that weapons and ammunition manufactured for the military eventually find their way into the marketplace for purchase by a consumer." Doc. 205 at PAGEID 4252.

The applicable provision of the OPLA imposes liability for inadequate warning or instruction on a "manufacturer" of a "product." O.R.C. § 2307.76. Liability can arise from a failure to adequately warn at both "the time of marketing" and "post-marketing." Id. Liability is imposed when two conditions are satisfied:

(a) The manufacturer knew or, in the exercise of reasonable care, should have known about a risk that is associated with the product and that allegedly caused harm for which the claimant seeks to recover compensatory damages;

(b) The manufacturer failed to provide [at the time of marketing or post-marketing] the warning or instruction that a manufacturer exercising reasonable care would have provided concerning that risk, in light of the likelihood that the product would cause harm of the type for which the claimant seeks to recover compensatory damages and in light of the likely seriousness of that harm.

O.R.C. § 2307.76.(A)(1), (2). A "manufacturer" is "a person engaged in a business to design, formulate, produce, create, make, construct, assemble, or rebuild a product or a component of a product." O.R.C. § 2307.71(A)(9).

---

[2] According to plaintiff, Ammoman has produced minimal discovery. Doc. 205 at PAGEID 4249. PW Arm's representative made statements during his deposition suggesting that other importers and dealers like PW Arm's exist and that Ammoman could have purchased ammunition from any of them. See Phineas Dep. at 22, 23, 27, 28, 43, 45, 80.

The key issue on summary judgment is whether the ammunition made by DGFM is a "product" as defined by the OPLA. "Product" means "any object, substance, mixture, or raw material that constitutes tangible personal property" which satisfies each of the following three criteria:

> (i) It is capable of delivery itself, or as an assembled whole in a mixed or combined state, or as a component or ingredient.
>
> (ii) It is produced, manufactured, or supplied for introduction into trade or commerce.
>
> (iii) It is intended for sale or lease to persons for commercial or personal use.

O.R.C. § 2307.71(A)(12)(a).

DGFM argues that the second and third criteria are not met because the ammunition was manufactured for military use alone. DGFM contends that there is no evidence to support an inference that it intended the ammunition to be placed into trade or commerce or to be sold.

Plaintiff responds that DGFM's intention for the use of the ammunition is irrelevant. In support, he cites the Sixth Circuit's decision in this lawsuit that DGFM is not entitled to foreign sovereign immunity. The Sixth Circuit held that "whether the ammunition was used or intended for military purposes is of no consequence." Rote v. Zel Custom Mfg. LLC, 816 F.3d 383, 391 (6th Cir. 2016). Plaintiff observes that this court, in ruling on the sovereign immunity issue, likewise focused on the nature of DGFM's activity (the manufacturing of a good) rather than on the intended use of the good. See Rote v. Zel Custom Mfg., LLC, No. 2:13-cv-1189, 2015 WL 570973 at *6 (S.D. Ohio Feb. 11, 2015).

Plaintiff's reliance on legal analysis from the foreign sovereign immunity decision is misplaced. The provision of the Foreign Sovereign Immunities Act at issue dealt with the "commercial activity" exception to immunity. The FSIA's definition of a commercial activity expressly removes the activity's purpose from consideration: "The commercial character of an activity shall be determined by reference to the nature of the course of conduct or particular transaction or act, rather than by reference to its purpose." 28 U.S.C. § 1603(d). Under the FSIA, "the issue is whether the particular actions that the foreign state performs (whatever the motive behind them) are the type of actions by which a private party engages in trade and traffic or commerce." Republic of Argentina. v. Weltover, Inc., 504 U.S. 607, 614 (1992). The Sixth Circuit accordingly held in this case:

> What matters is that DGFM acted like a private market participant when it designed and manufactured the allegedly defective product; and DGFM does not assert that only governmental actors manufacture and design ammunition. If we give any weight to the fact that the ammunition was manufactured for military purposes, we would in

9

> effect flout Congress and the Supreme Court's express instruction that courts must look to the nature of the wrongful activity rather than its purpose.

Rote, 816 F.3d at 391.

In contrast to the FSIA, the OPLA expressly conditions applicability of the statute on whether the object is "for introduction into trade or commerce" and whether it is "intended for sale or lease to persons for commercial or personal use." O.R.C. § 2307.71(A)(12)(a)(ii), (iii). The statute does not define "for" or "intended," but the ordinary meaning of both words signifies a purpose. See State v. Zupancic, 62 Ohio St. 3d 297, 300-01, 581 N.E.2d 1086, 1089 (Ohio 1991) (using the ordinary meaning of a word where the statute leaves it undefined). The Oxford English Dictionary defines the applicable use of "for" as meaning "with the object or purpose of," and it defines "intend" as "to have in the mind as a fixed purpose; to purpose, design." Oxford English Dictionary (2d ed. 1989). See also Merriam-Webster Online Dictionary (stating that "for" is "used as a function word to indicate purpose" and defining "intend" as "to have in mind as a purpose or goal").

The OPLA also leaves the terms "trade," "commerce" and "sale" undefined. "Trade" is the "buying and selling of goods and commodities." Oxford English Dictionary (2d ed. 1989). "Commerce" is the "'exchange of goods, productions, or property of any kind.'" Zupancic, 62 Ohio St. 3d at 301, 581 N.E.2d at 1089 (quoting Black's Law Dictionary (6th ed. 1990)) (emphasis omitted). A "sale" is a transaction in which a good is exchanged for consideration. See O.R.C. § 5739.01(B) (Ohio Tax Code's definition of "sale"); Oxford English Dictionary (2d ed. 1989) (defining "sale" as the "exchange of a commodity for money or other valuable consideration.").

DGFM has submitted evidence that it did not manufacture the ammunition at issue for introduction into trade or commerce and did not intend the ammunition for sale to persons for commercial or personal use. Dr. Arpin's declaration states that DGFM manufactured 12.7 x 99 mm cartridges in the 1980s for the Armed Forces of the Republic of Argentina. See Arpin Decl. at ¶ 5. He further states that under the applicable firearms and explosive regulations, the 12.7 x 99 mm ammunition which DGFM manufactured was for the exclusive use of the Argentine military. See Arpin Decl. at ¶ 5; see also Doc. 193 at PAGEID 2683 (plaintiff's expert stating his opinion that the ammunition was made for military use). There is no record of DGFM having sold or delivered the ammunition to anyone other than the Argentine military. See Arpin Decl. at ¶ 5.

Plaintiff has not submitted any evidence to the contrary. The evidence establishes without genuine dispute that the foreign sovereign manufactured the ammunition exclusively for its own internal, military use. There is no evidence that DGFM manufactured the ammunition for the purpose

10

of bringing it into an exchange of goods or commodities or with the intention of selling it for consideration. The court finds as a matter of law that the OPLA's definition of a product is not satisfied in this situation. See Jessop v. Angelo Benedetti, Inc., No. 80600, 2003 Ohio 3 at ¶ 19, 2003 WL 23114 at *3 (Ohio Ct. App. Jan. 2, 2003) (holding that the OPLA's definition of a "product" is not satisfied where "the undisputed evidence shows that defendant designed and developed the Machine for exclusive use by its employees solely in its paving business").

Other statutory provisions confirm the court's conclusion that Ohio's product liability statute does not apply to the foreign sovereign's production of ammunition solely for military use. Consider, for instance, the inadequate warning provision under which plaintiff seeks to hold DGFM liable. O.R.C. § 2307.76. It is premised on an "at the time of marketing" and "post-marketing" dichotomy. Or consider the statute of repose. O.R.C. § 2305.10(C)(1). The triggering event is delivery to the "first purchaser." These statutory reference points do not apply here because DGFM never marketed the ammunition nor delivered it to a purchaser.

DGFM has identified two occasions in which 12.7 x 99 mm ammunition potentially passed out of the control of the Argentine military. The first was by abandonment when Argentina lost the Falkland Islands War in 1982. The second was by smuggling when a cabal of government officials sold warfare material in the 1990s to Croatia and Ecuador.

The OPLA's definition of a product is not satisfied by either situation. In no sense can wartime abandonment of ammunition in a theater of conflict count as an action done with the purpose of introducing the ammunition into trade or commerce. And the movement or exchange of the ammunition to Croatia and Ecuador was accomplished without the authorization of the foreign sovereign. That is, it was not the purpose or intent of Argentina to supply the ammunition to Croatia and Ecuador. As the foreign judgment establishes, the movement of the ammunition was an act of smuggling which occurred contrary to the laws of Argentina and for which the individuals responsible incurred criminal sanctions.[3]

---

[3] One might argue, though plaintiff does not, that the foreign sovereign should be responsible for the conduct of its own officials, even if unauthorized. See Restatement (Third) of Agency § 2.03 (Apparent Authority). Their conduct arguably satisfies the OPLA in that they appear to have acted with the purpose of supplying the ammunition for introduction into trade or commerce and that they did in fact sell the ammunition to Croatia and Ecuador.

Such a theory would nonetheless fail. The doctrine of apparent authority does not apply to sovereigns, save for exceptions that do not apply here. See Restatement (Third) of Agency § 2.03, cmt. g (discussing governmental actors). Moreover, even if the unlawful actions of the government officials

11

Plaintiff emphasizes that it is common knowledge that military goods eventually find their way into the marketplace. But inevitability does not provide a basis for imposing a state product liability statute on a foreign sovereign. Cf. Queen City Terminals, Inc. v. Gen. Am. Transp. Corp., 73 Ohio St. 3d 609, 622, 653 N.E.2d 661, 672 (Ohio 1995) (holding that a custom-made object which "was coaxed into the market" could not be said to have been placed into the stream of commerce by its manufacture). Plaintiff must satisfy the prerequisites of the OPLA, which he has not done.

## V.     Claim Against Ammoman

Plaintiff has filed a motion for summary judgment on his supplier liability claim against Ammoman. O.R.C. § 2307.78. The document is more of a notice than a motion. Plaintiff concedes that "there is no evidence that Ammoman is liable for its own negligence." Doc. 200 at PAGEID 4102. Plaintiff characterizes his claim as being wholly dependent upon him showing that Ammoman supplied a product for which DGFM is liable under the OPLA. Id. ("To prevail on this claim, [plaintiff] must show that DGFM is liable under [the OPLA] and that one of the eight conditions under which Ammoman can be held liable under Ohio Rev. Code § 2307.78(B) applies."). Thus, plaintiff advises the court that he will seek to hold Ammoman liable only if he "obtain[s] a judgment against DGFM and DGFM is unable to satisfy the judgment." Id.

Now that the court has granted summary judgment to DGFM on all claims, it would appear that plaintiff does not have a claim to pursue against Ammoman. Plaintiff is therefore instructed to file a statement within ten days of the date of this order indicating whether he intends to pursue a supplier liability claim against Ammoman.

## VI.    Conclusion

Accordingly, DGFM's motion for summary judgment (doc. 197) is GRANTED. Plaintiff's motion for summary judgment against Ammoman (doc. 200) is DENIED. The Clerk of Court shall terminate DGFM's motions to strike the jury demand (doc. 231) and to excuse DGFM from sending a client representative to attend the final pretrial conference (doc. 238) as moot.

---

caused the OPLA's definition of a "product" to be satisfied, the statute of repose would present an insurmountable obstacle for plaintiff. The statute provides that no cause of action shall accrue against the manufacturer of a product "later than ten years from the date that the product was delivered to its first purchaser." O.R.C. § 2305.10(C)(1). The first purchaser under this theory would be military groups in Croatia or Ecuador, and their purchases took place in the first half of the 1990s, more than ten years before plaintiff's injury in 2011.

Plaintiff shall notify the court within ten days of the date of this order whether he intends to pursue a supplier liability claim against Ammoman.

s/ James L. Graham  
JAMES L. GRAHAM  
United States District Judge

DATE: April 12, 2019